**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| **JOHN DAVID COMEAU, JOSEPH GOURLAY and MAGDY WILLIAM GAYED,** | **File No.:** _____ |
| **Plaintiffs,** | |
| **v.** | |
| **ABRAHAM MIRMAN, GUNNALLEN FINANCIAL, INC., JADE SECURITIES, LLC, JADE CAPITAL, LLC, JADECO HOLDINGS, LLC, CRESTA CAPITAL STRATEGIES, LLC and MAXIMUM VENTURES, INC.** | **COMPLAINT** **(Jury Trial Demanded)** |
| **Defendants.** | |

**COMPLAINT**

**NOW COMES,** Plaintiffs, John David Comeau, Joseph Gourlay and Magdy William Gayed (collectively, "Plaintiffs" and individually, "Comeau", "Gourlay" and "Gayed", by and through their attorneys, Gregory Bartko, Esq., of the Law Office of Gregory Bartko, LLC, and hereby file the following as and for their Complaint against the Defendants named above, on a joint and several basis. In support of this Complaint, Plaintiffs allege as follows:

**Summary of Complaint**

1.      This lawsuit arises from the Defendants' breach of an agreement entered into among the Plaintiffs and the Defendant, Abraham Mirman ("Mirman"), as well as one or more of the corporate Defendants, all of which but Defendant, GunnAllen Financial, Inc. ("GunnAllen"), are controlled by and are the alter egos of Mirman with respect to the agreements, promises and wrongful conduct alleged herein by the Plaintiffs.

2.     Defendants as defined in this Complaint, hold themselves out as investment banking experts registered as broker-dealers or representatives of broker-dealers under § 15 (b) of the Securities Exchange Act of 1934 ("Exchange Act"). At all times relevant to the Plaintiffs' claims, Mirman was a registered representative and principal of GunnAllen and Cresta Capital Strategies, LLC ("Cresta" and"Broker-Defendants") and as such various provisions of the Federal securities laws and regulations govern Mirman's conduct with respect to Plaintiffs' claims and further govern the duties, supervisory responsibilities and oversight obligations of the Broker Defendants with respect to Mirman. Plaintiffs' claims are brought against the Broker-Defendants under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and under common law principles of *respondeat superior*.

3.     Mirman, in concert with the remaining Defendants, agreed to compensate the Plaintiffs for introducing investment banking clients to them and for introducing sources of capital funding (investors) to the Defendants for financial transactions consummated for the benefit of several investment banking clients of the Defendants. Beginning in March 2005, Plaintiffs entered into a series of contractual relationships with Mirman, in concert with and in participation with  the remaining Defendants, that resulted in Defendants consummating several investment banking and capital financing transactions. Although the Defendants made numerous false representations to the Plaintiffs and provided ongoing assurances which the Plaintiffs relied upon, Mirman, in concert with the remaining Defendants, breached all of their promises to compensate the Plaintiffs for their introductions and efforts as alleged herein.

4.     This Complaint seeks recovery of the compensation promised to the Plaintiffs by Mirman and the remaining Defendants. Plaintiffs' claims are based, in part, upon duties and claims created by virtue of Federal securities laws as contained in the Exchange Act, as Mirman

and the Broker Defendants are governed by regulations and responsibilities imposed upon them under the Exchange Act.

## Jurisdiction and Venue

5.      This action seeks monetary damages, *inter alia*, for violations of [broker dealer failure to supervise]. Jurisdiction arises under the Securities Exchange Act of 1934, 15 U.S.C. §78aa and 28 U.S.C. §1331 based on the principal claims asserted herein being based upon Federal question jurisdiction.

6.      Comeau is an individual who resides at 1866 Center Groton Road, Ledyard, Connecticut and is a citizen of the State of Connecticut.

7.      Gayed is an individual who resides at 5 North Chukkar Court, Galloway, New Jersey 08205 and is a citizen of the State of New Jersey.

8.      Gourlay is an individual who resides at 20000 East Country Club Drive, Apartment 410, Miami, Florida 33180 and is a citizen of Florida.

9.      Defendants Mirman, Jade Securities, LLC, Jade Capital, LLC and Jadeco Holdings, LLC ("Jade Defendants"), Cresta, and Maximum Ventures, Inc. ("Maximum"), all conduct their business from the same office location within the State of New York, which is at 1175 Walt Whitman Road, Suite 100, Melville, New York 11747. Prior to his termination from GunnAllen in October 2006, Mirman and the remaining Defendants also conducted their business at offices located at 400 Park Avenue, 14th Floor, New York, New York 10022.

10.     Mirman is an individual who resides at 5 Stonehenge Lane, East Northport, New York 11731 and is therefore a citizen of the State of New York. The Jade Defendants, Cresta and Maximum are all corporate entities formed under the laws of the State of New York, doing business within the state of New York and are citizens of the state of New York. Between

November 2005 through October 2006, Mirman was a registered Series 24 principal and employee of GunnAllen. Between November 2006 through the present date, Mirman has been a registered Series 24 principal and employee of Cresta. Prior to November 2005, Mirman was an officer and control person of the Jade Defndants. On information and belief, Mirman and the Jade Defendants held themselves out and represented to the Plaintiffs that they were authorized as an "Office of Supervisory Jurisdiction" of the GunnAllen.

11.     Defendant, GunnAllen, is a large, multi-state full service investment banking and brokerage firm with its corporate headquarters located at 5002 West Waters Avenue, Tampa, Florida 33634. During the time that Mirman was employed and registered with GunnAllen, the Defendants collectively conducted their business from offices located at 400 Park Avenue, Suite 1430, New York, New York 10022. GunnAllen is a citizen of the State of Florida for jurisdictional purposes.

12.     GunnAllen and Cresta are broker-dealers registered as such with the United States Securities and Exchange Commission ("SEC") pursuant to § 20 of the Exchange Act, and as such, provisions of the Exchange Act and regulations promulgated there under by the SEC require GunnAllen and Cresta to provide supervision, procedures and controls over its employees, registered representatives and other agents, one of which was Mirman.

13.     As Mirman's employers and supervising broker-dealers, GunnAllen and Cresta are jointly and severally liable for the torts and other wrongful acts and illegal business practices perpetrated by Mirman during the course of his employment with GunnAllen and thereafter with Cresta. During all times relevant to this Complaint, Mirman held himself out as a "partner" and "co-owner" and authorized representative of GunnAllen and Cresta and was acting within the scope of GunnAllen's and Cresta's employment in the investment banking business when he

perpetrated the unlawful acts alleged herein. GunnAllen and Cresta cloaked Mirman with apparent authority to act in the capacities he so represented to the Plaintiffs.

14.     The wrongful acts, breach of contract and tortuous conduct of the Defendants alleged in detail in this Complaint occurred principally within the states of Florida and/or New York.  In fact, it was at the Lago Mar Resort and Club, 1700 South Ocean Lane, Fort Lauderdale, Florida 33316 at a meeting with Plaintiffs that Mirman prepared a handwritten summary of the investment banking fees he generated from his relationship with the Plaintiffs, which summary included Mirman's calculation of the Plaintiffs' 15% Fee, as defined in this Complaint.

## Background Facts

15.     In March, 2005, Gayed and Comeau attended a meeting with Mirman. During and after the meeting, which included other investment banking and finance representatives from other firms, Mirman expressed an interest in entering into a business arrangement with Gayed and Comeau that would provide new and additional potential investment banking clients to Mirman as well as new sources of investment capital that would then be available to Mirman for him to consummate financial transactions with.

16.     During the first meeting conducted with Mirman, and all of the subsequent contacts that occurred between Mirman and the Plaintiffs, Mirman represented himself to be an investment banking professional employed by GunnAllen. Mirman represented to Plaintiffs on numerous occasions that he was a "co-owner" of GunnAllen. At all times pertinent to this Complaint, GunnAllen, as a registered broker-dealer and as Mirman's employer, had a duty to supervise the activities and conduct of Mirman. After Mirman terminated his relationship with GunnAllen in November 2006, he then became registered with and employed by Cresta, which had the same duties of supervision as did GunnAllen.

Plaintiffs' Initial Complaint [8.7.2008]

17.     As an employee and registered representative of GunnAllen and later Cresta, GunnAllen and Cresta were both "control persons" of Mirman during all relevant times alleged in this Complaint. As a control person of Mirman, GunnAllen and Cresta are both jointly and severally liable for Mirman's unlawful acts, his schemes and the breach of contract by Mirman herein alleged. Pursuant to § 15 of the Exchange Act, GunnAllen and Cresta are persons that, directly or indirectly, controlled Mirman with respect to Mirman's activities as a broker and investment banking representative of the Broker Defendants.

18.     GunnAllen and thereafter Cresta, as Mirman's supervising broker-dealers were in a position at all relevant times to the Plaintiff's Complaint, to monitor and supervise Mirman's business practices and activities and knew or should have known that Mirman not only entered into the agreements with the Plaintiffs to compensate them for their referrals to Mirman, but also knew, or should have known that Mirman breached each and every agreement with Plaintiffs. It was GunnAllen that facilitated the sponsorship of Comeau and Gayed to become Series 7 registered representatives of GunnAllen so they could earn more fees resulting from their referrals. Comeau and Gayed were even given GunnAllen business cards at the behest of Mirman.

19.     GunnAllen, and later Cresta, actively participated in the business dealings and agreements that Mirman entered with the Plaintiffs. Further, upon information and belief, GunnAllen, Cresta and the remaining Defendants all financially benefitted through the generation of substantial investment banking and related fees received on Mirman's transactions.

20.     At the time of the initial March 2005 meeting with Mirman, Plaintiffs were associated with each other through one or more business opportunities they had collectively worked on. During the course of their association, Plaintiffs had amassed business relationships

with several wealthy private investors in Florida and relationships with various public companies

that were interested in sourcing investment capital or acquisition and merger opportunities.

Plaintiffs' association in this regard ripened into a willingness to earn fees in the form of cash

and/or capital stock of the client companies they became associated with.

21.     Upon Mirman learning of the Plaintiffs' relationships with various wealthy

private investors and public companies looking to source capital and acquisition opportunities,

Mirman told Gayed and Comeau after the March 2005 meeting that he would agree to

compensate them by paying to Plaintiffs a "finder's fee" or "introduction fee" of 15% of

Mirman's compensation for referring and introducing corporate clients or investors to Mirman

whereby Mirman subsequently represented in financing transactions. Mirman expressly agreed

to deliver 15% of his gross compensation, both cash and non-cash, to the Plaintiffs for each such

transaction actually consummated through introductions or referrals made to Mirman by the

Plaintiffs. Plaintiffs' fee is referred to throughout the remainder of this Complaint as the "15%

Fee."

22.     After the March 2005 meeting with Mirman, Mirman invited Gayed and Comeau

to his office at 400 Park Avenue, 14th Floor, New York, New York 10022 for a follow up

meeting to iron out the specifics of the agreement between the parties. During the office meeting,

Mirman again reiterated that he would gladly compensate the Plaintiffs a fee payable in cash or

capital stock equal to 15% of the gross fee (cash or capital stock) that Mirman received on

investment banking, acquisition transactions or investors referred to him by the Plaintiffs.

23.     During the office meeting, Mirman also indicated to Gayed and Comeau that

although they could earn the 15% Fee as discussed, both Plaintiffs could make "some real

money" if they agreed to become registered representatives of his firm, GunnAllen. Mirman

explained the registration process to Gayed and Comeau. During this part of the meeting,

Mirman represented to Gayed and Comeau that once they were registered representatives of

GunnAllen, he (Mirman) would compensate the Plaintiffs a percentage of Mirman's fees

generated on his management participation in what Mirman characterized as a "special strategy

fund." In this regard, Mirman represented to Gayed and Comeau that, once registered with

GunnAllen, they would receive one-half of the 2% management fee paid to the fund manager,

Mirman and that Gayed and Comeau would receive one-half of the carried interest earned by the

fund manager, which Mirman represented to be 10%.

        24.     During the March 2005 meeting and the office meeting with Mirman thereafter,

Comeau indicated to Mirman that he (Comeau) and Gayed had a third partner, Gourlay, who was

located in Miami, Florida who was well connected to several wealthy private investors, including

Stephen Posner and Ron Berkovitz. Comeau and Gayed indicated to Mirman during these

discussions that Gourlay would participate with them in the referrals and introductions the

Plaintiffs agreed to make to Mirman.

        25.     On the basis of Mirman's agreement and promises made during the March 2005

meeting and the follow up office meeting with Mirman, an agreement was reached among the

Plaintiffs and Mirman that Plaintiffs would receive the 15% Fee for each and every financing

transaction consummated by Mirman through sources of investment capital or potential client

companies referred to Mirman by the Plaintiffs. Mirman agreed to these terms.

        26.     On the basis of the agreement with Mirman and in reliance thereon, Comeau and

Gayed immediately began the process of qualifying to become registered representatives of

GunnAllen. Both of said Plaintiffs studied for and passed the Series 7 General Securities

Representative examination conducted at that time by the National Association of Securities

Dealers, Inc. ("NASD"). In order to become eligible to qualify for the Series 7 examination, a person must be sponsored by a member broker-dealer of the NASD. With respect to Gayed and Comeau, each of said Plaintiffs was sponsored by GunnAllen at the urging of Mirman.

27.     In reliance on the agreement with Mirman, Comeau and Gayed, both qualified to become registered representatives of GunnAllen on December 6, 2005 and in fact were so registered and employed by GunnAllen and Mirman thereafter.

28.     Prior to becoming Series 7 General Securities Representatives with GunnAllen at Mirman's urging, and even after their registration with GunnAllen, the Plaintiffs' role in the introduction and referral of investor and client contacts to Mirman would not have caused Plaintiffs to fall within the definition of "broker" under § 3(a)(4)(A) of the Exchange Act.

29.     However, even before becoming registered as agents of GunnAllen, and in reliance on Mirman's agreements, all three Plaintiffs immediately began to make introductions and referrals directly to Mirman of their contacts with wealthy private investors and potential client companies seeking to raise investment capital or consummate acquisitions or mergers.

30.     In numerous telephone conversations with Mirman and hundreds of email messages that originated from Mirman or were directed to Mirman by the Plaintiffs commencing as early as March 10, 2005, the agreements, promises and representations made by Mirman to the Plaintiffs regarding Mirman's commitment to pay Plaintiffs the 15% Fee, was repeatedly discussed and documented. Mirman's email messages between March 10, 2005 through early 2006, which bore his digital identification, include his agreements and representations to compensate the Plaintiffs as they expected and as Mirman assured him he would.

31.     Mirman's electronic communications in the form of email transmissions, constitute a written agreement binding upon Mirman and the remaining Defendants in

accordance with the Electronic Signatures in Global and National Commerce Act ("ESIGN Act"), which is codified at 15 U.S.C. §7000.[1] At all times relevant to the agreements entered into by Mirman with the Plaintiffs, Mirman was a duly appointed and acting employee and registered principal of GunnAllen, Cresta and the Jade Defendants. Mirman bound not only himself to his agreements and promises to the Plaintiffs, but he bound his employers, GunnAllen, Cresta as well as the entities that he controlled through which he conducted his investment banking and finance business, the Jade Defendants.

32.     In addition, in furtherance and part performance of Mirman's agreements as described herein, Mirman caused a check to issue by the Defendant, Jadeco, to Gayed on January 5, 2006 in the amount of $200,000.00 for a cash finder's fee that the Plaintiffs had earned by virtue of their successful referral of Charys Holding Company, Inc., 1117 Perimeter Center West, Suite N415, Atlanta, GA 30338 ("Charys Fee") to Mirman for investment banking services and capital raising transactions. However, Mirman never authorized the Plaintiffs to deposit this check or take receipt of the Charys Fee for reasons unknown to the Plaintiffs but due to a series of excuses and other assurances given to them by Mirman.

33.     In fact, the Plaintiffs had relied on the *bona fides* of Mirman during their business association with him in large measure due to Mirman's affiliation with GunnAllen, which is a trade name that the Plaintiff's recognized as having credibility and standing in the investment banking community. Plaintiffs believed that if Mirman was in fact an investment banking "co-owner" of GunnAllen, that he had credibility and experience they could rely on.

---

[1] Although Plaintiffs assert that Florida substantive state law controls the non-federal claims alleged herein, Plaintiffs further assert that the various written email communications by Mirman to the Plaintiffs, which included Mirman's digital signature on the large majority of those communications, constitute a sufficient writing required by N.Y. Gen. Oblig. Law § 5-701(a)(10).

34.     The Plaintiffs performed their part of the agreements reached with Mirman by referring and introducing several key private investors to Mirman, including but not limited to Raymond Bazzano, Stephen Posner, Ron Berkovitz, Mel Harris, Nelson Peltz, Michael Harvey, Will Browning and Michael Krupen. In addition, the Plaintiffs provided additional referrals and introductions to Mirman of several companies that Mirman subsequently landed investment banking relationships with and consummated financing transactions on behalf of, including, but not limited to Charys, Miller Petroleum, Inc. ("Miller Petroleum"), with its executive office location at 3651 Baker Highway, Huntsville, Tennessee 37756, Viasys Network Services, Inc. and Viasys Services, Inc., (collectively "Viasys "), with its executive office location at  2944 Drane Field Rd. Lakeland, Fl. 33811and Harris Financial Group, LLC, with its principal office location at 320 Hobson Street, Sevierville, TN 37876 ("Harris Group").

35.     It was due to Plaintiff's performance of their agreements with Mirman that Mirman consummated financing transactions with the persons and issuers named above. Mirman had no independent relationship with the investors referred to him by the Plaintiffs. Mirman, however, breached his agreements to deliver compensation to the Plaintiffs by failing and refusing to deliver the Plaintiffs' portion of his compensation earned on transactions he consummated with persons or issuers introduced and referred to Mirman by the Plaintiffs.

36.     Even after the consummation of financing transactions for the benefit of the persons referred to him by the Plaintiffs, Mirman lied and misrepresented the status of transactions that had been consummated and upon which Plaintiffs were entitled to fees. Mirman's unlawful conduct and misrepresentations were intentional and purposeful in order to avoid paying over any of his compensation to the Plaintiffs as agreed. In fact, the Defendants methodically and repeatedly pursued a course of action designed to "lull" the Plaintiffs into

believing that if they gave the Defendants additional time and remained patient with respect to their demands, the Defendants would fully comply with their agreements.

37.     Plaintiffs allege, upon information and belief, that the Defendants' lulling of the Plaintiffs was a conscious and purposeful scheme or plan to entice the Plaintiffs into believing that their 15% Fee would ultimately be delivered to them and that the Defendants would not ultimately fail to abide by Mirman's agreements. Many such representations were made by Mirman and the remaining Defendants to the Plaintiffs, both verbally and in written form.

38.     Plaintiffs ultimately came to the conclusion that the Defendants were not going to honor Mirman's agreements with respect to the 15% Fee. It was at that time that Plaintiffs decided to seek legal redress for the claims stated herein.

39.     Plaintiffs have actual knowledge that Mirman earned compensation directly connected to their services as introducing parties based on financing transactions consummated by Charys, Miller Petroleum, the Viasys acquisition by Charys and the Harris Group. However, on information and belief, Plaintiffs allege that Mirman has consummated or is now working to consummate additional financial transactions using Plaintiffs' sources and introductions, but Mirman has failed and refused to provide the Plaintiffs with any reliable information on such transactions; Plaintiffs herein pray for an order of this Court requiring Mirman to account for his investment banking compensation and business arrangements with any persons or issuers introduced and referred to Mirman by the Plaintiffs.

40.     As a direct and proximate result of Mirman's actions, inactions and misrepresentations as alleged herein, including the intentional breach of his agreements with the Plaintiffs entitling said Plaintiffs to receive 15% of Mirman's compensation, Plaintiffs have been damaged by Mirman's failure and refusal to pay over to them the 15% Fee.

41.     Subject to an accounting to be required of Mirman as prayed for in Count IV of this Complaint, Plaintiffs have not received their 15% Fee they are entitled to pursuant to Mirman's agreements.

### Count I—Breach of Contract
### (Against All Defendants)

42.     Plaintiffs hereby incorporate by reference paragraphs 1 through 41 of this Complaint, the same as if each of said allegations were recited in full herein.

43.     Mirman, on behalf of himself and as an authorized representative of the remaining Defendants, entered into  agreements with the Plaintiffs which provided in relevant part that the Plaintiffs collectively would receive "success fees" equal to 15% of all compensation (both cash and non-cash) received by the Defendants in a series of investment banking and financing transactions where Mirman and the remaining Defendants ultimately received gross commissions and success fees at the successful consummation of the transactions.

44.     In furtherance of Mirman's agreements, Mirman individually and through one or all of the Jade Defendants and Maximum as his alter egos, stated to the Plaintiffs on multiple occasions that Plaintiffs would receive the 15% Fee on a series of four (4) successful financing transactions: (i) Charys Holdings; (ii) Miller Petroleum; (iii) Harris Group; and (iv) Viasys. Mirman's agreements with the Plaintiffs are binding upon GunnAllen and Cresta, as both of the Broker Defendants couched Mirman with authority to conduct an investment banking business on their behalf; and they knew or should have known of his agreements with the Plaintiffs.

45.     Plaintiffs relied on Mirman's agreements and promises and justifiably so. As an example of their reliance, Plaintiffs introduced Mirman and the remaining Defendants to several high net worth investors, including Ron Berkovits and Stephen Posner, both of whom subsequent

to their introductions, participated in large financing transactions undertaken by Mirman and the remaining Defendants.

46.     In further reliance on Mirman's agreements and assurances, Plaintiffs took steps to become general securities representatives of GunnAllen. These steps included providing background information for Comeau and Gayed for purposes of filing a Form U-4 for each of Comeau and Gayed; devoting time and expense for study necessary for the successful passing of the Series 7 General Securities Exam administered by the National Association of Securities Dealers, Inc. ("NASD" which is now known as "FINRA"), and coming under the supervisory control and compliance of Mirman, GunnAllen and later, under Cresta.

47.     Commencing in March 2005 and continuing through June 2008, through Plaintiffs' introductions to the Defendants of their sources of investment capital, and in reliance upon Mirman's agreements, Mirman and the remaining Defendants consummated several financing transactions due in large measure to Plaintiffs' efforts and referrals of investors to the Defendants.

48.     With respect to the financing transaction arranged by the Defendants with Charys Holdings, on information and belief, Defendants successful placed approximately $11,200,00.00 in financing through Plaintiffs' referrals of Berkovitz and Posner. Of this aggregate amount of financing received by Charys Holdings, and upon information and belief, Mirman individually received approximately $2,510,640 in cash and non-cash compensation in the form of notes and warrants to purchase common stock of Charys Holdings. Of these commissions received by Mirman and the remaining Defendants, pursuant to Mirman's agreements, Plaintiffs were entitled to 15% thereof, which totals approximately $377,350.00.

49.     Mirman and the remaining Defendants breached their agreements by failing and refusing to pay Plaintiffs their 15% Fee on the Charys Holdings financing transactions. Even though the Plaintiffs have demanded delivery of their 15% Fee on multiple occasions, and even though Mirman has partially paid the Plaintiffs the sum of $60,000.00 of their 15% Fee, there is due and owing to the Plaintiffs the following compensation, which continues to remain unpaid. The unpaid 15% Fee described in the following tables is calculated based on information obtained from Mirman and other sources, but in reality, the 15% Fees may be higher than the calculations available to the Plaintiffs:

## Charys Holdings[2]

| Mirman/Defendants' Fees | | Plaintiffs' Unpaid 15% Fee |
|---|---|---|
| Cash Fee | $195,000.00 | $30,000 Paid |
| Cash Fee | $1,300,000.00 | $165,000 Cash |
| Notes Issued | 818,789 | 122,818 Notes |
| Warrants | 196,850 | 29,528 Warrants |
| Common Stock | 250,000 | 250,000 Shares |

50.     Mirman and the remaining Defendants also breached the agreements by failing and refusing to pay Plaintiffs their 15% Fee on the Miller Petroleum financing transaction. Even though the Plaintiffs have demanded delivery of their 15% Fee on multiple occasions, the Mirman and the remaining Defendants have refused to deliver Plaintiffs' 15% Fee and have therefore breached their agreements. There is due and owing to the Plaintiffs the following, which continues to remain unpaid:

## Miller Petroleum

| Mirman/Defendants' Fees | Plaintiffs' Unpaid 15% Fee |
|---|---|

---

[2] Plaintiffs' 15% Fee due on the Charys Holdings transactions includes the acquisition by Charys Holdings of Viasys.

| | | |
|---|---|---|
| Cash Fee | $1,300,000 | $195,000 |
| Cash Fee | $9,700,000 | $1,455,000 |

51.     Mirman and the remaining Defendants also breached their agreements by failing and refusing to pay Plaintiffs their 15% Fee on the Harris Financial financing transaction. Even though the Plaintiffs have demanded delivery of their 15% Fee on multiple occasions, the Defendants have refused to deliver Plaintiffs' 15% Fee and have therefore breached their agreements. There is due and owing to the Plaintiffs the following, which continues to remain unpaid:

### Harris Financial

| Mirman/Defendants' Fees | | Plaintiffs' Unpaid 15% Fee |
|---|---|---|
| Cash Fee | $20,000,000 | $3,000,000 |

52.     As a direct result of the Defendants' breach of the agreements as identified above, Plaintiffs have sustained damages equal to the value of the cash and non-cash portions of their 15% Fee, which damages should be calculated and determined as of the date that delivery of the 15% was to be made by Mirman to the Plaintiffs.[3] Plaintiffs allege, on information and belief, that there are additional investment banking transactions arranged by Mirman through and with the investors referred to Mirman by Plaintiffs, but they are known only to Mirman and the remaining Defendants. Mirman should be compelled to account for his compensation generated on such additional transactions.

### Count II—Unjust Enrichment
### (Against All Defendants)

---

[3] Plaintiffs claim damages on the non-cash portion of their 15% Fee, based on the value of such non-cash consideration as of the date that Mirman and the remaining Defendants should have delivered the non-cash consideration.

53.     Plaintiffs hereby incorporate by reference paragraphs 1 through 52 of this Complaint, the same as if each of said allegations were recited in full herein.

54.     Mirman and the remaining Defendants have been unjustly enriched by their wrongful actions as alleged in this Complaint. Mirman and the remaining Defendants have continued to wrongfully retain the value of Plaintiff's 15% Fee and therefore should be compelled by Judgment of this Court to account for and deliver over and pay unto the Plaintiffs the amount of said unjust enrichment, equal to the value of the cash and non-cash portions of their 15% Fee, which unjust enrichment should be calculated and determined as of the date that delivery of the 15% was to be made by Mirman to the Plaintiffs.

### Count III—*Quantum Meruit*
### (Against All Defendants)

55.     Plaintiffs hereby incorporate by reference paragraphs 1 through 54 of this Complaint, the same as if each of said allegations were recited in full herein.

56.     In reliance on the statements, representations, writings and communications of Mirman and the remaining Defendants with respect to their entitlement to the 15% Fee for financial transactions successfully consummated with the Plaintiffs contacts, connections and investors, Plaintiffs provided valuable services to Mirman and the remaining Defendants which services included introducing Mirman and the remaining Defendants to Berkovitz and Posner among others, further resulting in the successful consummation of a series of financing transactions managed by Mirman and the remaining Defendants.

57.     As an alternative to the Plaintiffs' claim in Count I (Breach of Contract) and Count II (Unjust Enrichment) of this Complaint, Plaintiffs' services, efforts, introductions to investors and the entire panoply of Plaintiffs' arrangements with Mirman and the remaining Defendants, was valuable and ultimately generated large investment banking fees and

[17]

commissions that Mirman and the remaining Defendants received. Notwithstanding various conversations, communications, promises and written affirmations by Mirman that he intended to compensate the Plaintiffs for their services, Mirman and the remaining Defendants failed and refuse to do so.

58.     Plaintiffs' services to the Defendants as alleged herein have not been in any way compensated, except that Mirman did deliver the sum of $60,000.00 to Plaintiffs relative to the fees Mirman received on the financing transaction consummated with Charys Holdings. Reasonable and customary compensation in exchange for Plaintiffs' services to the Defendants equals no less than the 15% Fee calculated on the gross amount of fees received by Mirman. It is unfair and unconscionable for Mirman to take advantage of the Plaintiffs by utilizing the introductions and relationships established by the Plaintiffs for his benefit and then, repudiating the terms of his agreements to share his investment banking compensation with them.

59.     Plaintiffs are equitably entitled to receive fair and adequate compensation from Mirman and the remaining Defendants on a *quantum meruit* basis in the amount of 15% of Mirman's investment banking compensation.

### Count IV—Failure To Supervise
### (20 U.S.C. § 78t)
### (Against GunnAllen and Cresta Capital)

60.     Plaintiffs hereby incorporate by reference paragraphs 1 through 59 of this Complaint, the same as if each of said allegations were recited in full herein.

61.     § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), provides:

> "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

62.     At all times relevant to the facts alleged in this Complaint, Mirman was registered as a Series 24 Principal and a Series 7 General Securities Representative of the Defendant, GunnAllen and was thereafter subsequently registered as a principal and representative of the Defendant, Cresta. From the initial contact that Plaintiffs had with Mirman, he expressly held himself out as a "Managing Director of GunnAllen Financial, Inc. and Jade Securities, LLC." On other occasions, Mirman held himself out to be a co-owner of GunnAllen.

63.     On or about November 2, 2006, Mirman's relationship with GunnAllen was terminated, after which he then joined Cresta as "Chairman of the Board." Upon information and belief, Mirman currently is the Chairman of the Board of Cresta as well as the founder of another investment banking and finance company he controls, the Defendant Maximum Ventures, Inc. During Mirman's tenure with GunnAllen, he  regularly represented that he was responsible for closing investment banking and financing transactions of between $150 to $200 million in the aggregate.

64.     While associated with GunnAllen, Cresta and Jade Securities, all three Defendants had duties to supervise Mirman's activities on their behalf. Such duties include not only those duties created by § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), but also common law duties created by the employer-employee relationship between the Broker Defendants and Mirman.

65.     The Broker Defendants failed to adequately control, manage and supervise Mirman and his activities related to the investment banking transactions upon which the Plaintiffs claim they are entitled to their 15% Fee. In fact, Mirman was allowed to "run amok" as a principal for the Broker Defendants, even to the point of managing transactions in the state of Georgia on behalf of Charys Holdings after being denied agent registration by the Georgia

Secretary of State—Securities Division. As early as September 1998, the Securities Division of the Secretary of State determined that Mirman's "disciplinary history was unacceptable for registration as an agent in the state of Georgia."

66.     The Broker Defendants knew or, in the exercise of reasonable diligence, should have known that: (i) Mirman's disciplinary history required heightened supervision; and that (ii) Mirman was entering into fee-splitting arrangements with the Plaintiffs, which arrangements were disavowed and repudiated after the successful closing of the transactions giving rise to the payment of fees to Mirman and the Broker Defendants. The Broker Defendants failed to implement appropriate supervisory policies, procedures and internal controls to properly supervise Mirman's investment banking activities, which enabled Miram to wrongfully retain the 15% Fee due to the Plaintiffs.

67.     The failure of the Broker Defendants to properly supervise and control Mirman's activities with respect to the transactions giving rise to Plaintiffs' 15% Fee resulted in the Broker Defendants' failure to comply with § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) as well as the Broker Defendants' common law duty to control, oversee, manage and supervise their employees and agents under principals of *respondeat superior*. Since the Broker Defendants are controlling persons of Mirman, both under Federal securities laws and common law, said Broker Defendants are jointly and severally liable to the Plaintiffs for the losses they have sustained as a consequence of Mirman's actions.

### Count IV—Demand For An Accounting
### (Against All Defendants)

68.     Plaintiffs hereby incorporate by reference paragraphs 1 through 67 of this Complaint, the same as if each of said allegations were recited in full herein.

25

69.     Defendants are possessed with and in control of books, records and documentation evidencing the extent to which Mirman and the remaining Defendants received cash and non-cash investment banking fees from the financing transactions described in this Complaint. In fact, Plaintiffs assert, on information and belief, that Mirman has wrongfully retained Plaintiffs' 15% Fee.

70.     Plaintiffs have no adequate remedy at law to accurately calculate the amount of investment banking fees received by Mirman and the remaining Defendants and therefore, Plaintiffs are entitled to an order of the Court compelling the Defendants to account for all fees, commissions, compensation and value received by the said Defendants upon the successful consummation of the financing transactions facilitated by the Plaintiffs for the benefit of the Defendants.

71.     Plaintiffs hereby demand **TRIAL BY JURY**, with respect to those matters in this Complaint wherein Plaintiffs are entitled to same as a matter of law.

WHEREFORE, Plaintiffs pray for the following relief:

(i)     that a Judgment be entered in favor of the Plaintiffs against the Defendants, on a joint and several basis, in an amount which represents the agreed upon 15% Fee described in this Complaint; or alternatively

(ii)    that  Judgment be entered in favor of the Plaintiffs in *quantum meruit* in an amount equal to the 15% Fee due and owing to the Plaintiffs from Mirman and the remaining Corporate Defendants;

(iii)   that Judgment be entered in favor of the Plaintiffs for all pre-judgment interest that has accrued on all sums due and owing to the Plaintiffs, plus

costs and expenses of suit as well as reasonable attorneys' fees allowable by law;

(iv)     that the Court grant an order compelling the Defendants to prepare an accounting of all cash and non-cash consideration that they have received as compensation for their services as investment bankers with respect to the transactions consummated with the Plaintiffs' referrals; and

(v)     that Plaintiffs be granted such other and diverse relief as the Court deems just and proper.

Dated this 7th day of August, 2008.

Respectfully Submitted,

/s/ Gregory Bartko, Esq.
Gregory Bartko, Esq.
Law Office Of Gregory Bartko, LLC
Attorney For Plaintiff
Georgia Bar No. 040476
3475 Lenox Road, Suite 400
Atlanta, Georgia 30326
404-238-0550 (phone)
404-238-0551 (facsimile)